# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Information associated with Five Target | ) |
| Accounts/Identifiers, for Investigation of 21 | ) |
| U.S.C. § 841(a)(1) and Other Offenses | ) |

Case No.     MJ21-156

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachments A1 through A5, located in the Western District of Washington, there is now concealed property and evidence described in Attachment B. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crip P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of Controlled Substances |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits. Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of 365 days (give exact ending date if more than 30 days: <u>March 15, 2022</u>) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ by reliable electronic means; or ☐ telephonically recorded

*Applicant's signature*

Scott MacDonald, Special Agent
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone/

Date: March 16,, 2021

*Judge's signature*

MARY ALICE THEILER, U.S. Magistrate Judge
*Printed name and title*

City and state: <u>Seattle, Washington</u>

1
2

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
SEARCH WARRANTS, PEN-TRAP ORDERS, AND TRACKING WARRANTS**

3
4
5

STATE OF WASHINGTON  )
                                            )    ss
COUNTY OF KING          )

6

I, Scott MacDonald, being first duly sworn, hereby depose and state as follows:

7

**INTRODUCTION**

8
9
10

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following five cellular telephones:

11
12
13
14

a.      **Target Telephone 6 (TT6):**  A mobile telephone assigned to the number 206-531-6802, with International Mobile Subscriber Identity (IMSI) number 310260042717793.  **TT6** is a cellular telephone with service provided by T-Mobile.  **TT6** is subscribed to "Jorge Cruz" at "1868 se 160th St Renton WA 98055," and believed to be used by Unidentified Male 1 (UM1).  Service for **TT6** began on February 5, 2021;

15
16
17

b.      **Target Telephone 7 (TT7):**  A mobile telephone assigned to the number 206-712-0120, with International Mobile Subscriber Identity (IMSI) number 310260058892122.  **TT7** is a cellular telephone with service provided by T-Mobile.  **TT7** is subscribed to "Juan Ochoa" at "19703 68th st everett WA 98036," and believed to be used by Unidentified Male 2 (UM2).  Service for **TT7** began on January 8, 2021;

18
19
20
21
22

c.      **Target Telephone 8 (TT8):**  A mobile telephone assigned to the number 206-661-8358, with International Mobile Subscriber Identity (IMSI) number 310410296914848.  **TT8** is a cellular telephone with service provided by AT&T.  **TT8** is subscribed to "Eduardo Fragoso" at "5240 University Way NE, Seattle WA 98105," and believed to be used by Unidentified Male 3 (UM3).  Service for **TT8** began on October 29, 2020;

23
24
25
26

d.      **Target Telephone 9 (TT9):**  A mobile telephone assigned to the number 206-618-7780, with International Mobile Subscriber Identity (IMSI) number 310150735905365.  **TT9** is a cellular telephone with service provided by AT&T.  **TT9** is subscribed to "Ulises Morros125Yahoocom" at "4502 East 16th Street, Tucson, AZ 85711," and believed to be used by (UM4).  Service for **TT9** began on March 4, 2021; and

27
28

1

2

3

4

     e.    **Target Telephone 10 (TT10):**  A mobile telephone assigned to the number 206-578-8948, with International Mobile Subscriber Identity (IMSI) number 310260040310030.  **TT10** is a cellular telephone with service provided by T-Mobile.  **TT10** is subscribed to "Ana Dominguez" at "3030 NE 143rd Street, Apt A204, Seattle, Washington, 98125-8704," but believed to be used by Luis DOMINGUEZ-ARCE.  Service for **TT10** began on March 3, 2021.

5

6

7

8

    2.    Each of the Target Telephones is described, respectively, in Attachments A1 through A5, and the location information to be seized is described herein and in Attachment B.  This is the first such application for **TT6**, **TT7**, **TT8**, **TT9** and **TT10** in this judicial district, in connection with this investigation.

9

ECPA

10

11

12

13

14

    3.    The Court has jurisdiction to issue the proposed warrant under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

15

Pen Register Act

16

17

18

19

    4.    Because this warrant seeks the prospective collection of information that falls within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

20

21

22

23

    5.    The Court has jurisdiction to issue the requested pen-trap order because it is a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2).  Specifically, the Court is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 3127(2)(A)(i).

24

25

26

27

28

    6.    This application includes all the information required by the Pen Register Act.  *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1).  Namely, Exhibit 1 to this application is a certification from Assistant United States Attorney Marci L. Ellsworth that (1) identifies Homeland Security Investigations and the Drug Enforcement Administration as the law enforcement agencies conducting the investigation and (2) certifies the information likely

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 2
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

to be obtained is relevant to an ongoing criminal investigation being conducted by those agencies.  18 U.S.C. § 3122(b).  The Assistant United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

7.     A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted."  18 U.S.C. § 3127(3).  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."  18 U.S.C. § 3127(4).

8.     In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls.  Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers.  The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act.  Accordingly, the requested warrant will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with the Target Cell Phone without geographic limit.

9.     The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachment B of the requested warrant that T-Mobile, AT&T and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service.  Any entity providing such assistance shall be reasonably compensated by Homeland Security Investigations and/or the Drug Enforcement Administration, pursuant to 18 U.S.C. §

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 3
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrant.

10. **Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8)**.

11. I am also submitting this affidavit in support of an application for a warrant authorizting the real-time (GPS) tracking of the following three vehicles, described below and in Attachments A6 through A8, for a period of 45 days:

a. **Target Vehicle 12 (TV12)**: a Silver Toyota Rav4, bearing WA license plate BQA6215, registered to Luis Antonio DOMINGUEZ-ARCE at 16614 48th Ave W, Apt J101, Lynnwood, WA;

b. **Target Vehicle 13 (TV13)**: a Grey Honda CRV, bearing WA license plate BXT9535, registered to Carlos RAMIREZ-Eden at 2813 Gibson Road, Everett, WA; and

c. **Target Vehicle 14 (TV14)**: a white 2010 Toyota Camry bearing WA license plate BWP9426, registered to Jose Maria GUTIERREZ at 3310 Alderwood Avenue, Bellingham, WA.

12. I make this request based on the evidence described below, which establishes probable cause to believe that the target vehicles have been, are being, and will be used to facilitate drug trafficking in the Western District of Washington, in violation of 21 U.S.C. §§ 841 and 846, and that the information collected pursuant to the warrant will further the investigation of these violations. This is the first such request for **TV12, TV13** and **TV14** in this judicial district, in connection with this investigation.

13. In addition, for the reasons outlined below, I also request authorization for agents/officers/technicians to enter the driveways of any address where **TV12, TV13** and

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 4
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

1  **TV14** are routinely parked, to install, remove, repair, or adjust an electronic tracking
2  device on or within **TV12, TV13** and **TV14** at any time of day or night.

3       14.    I further request authorization to:

4            a.    Install, remove, monitor, repair, or adjust an electronic tracking
5  device on or within the vehicle at any time of the day or night;

6            b.    If necessary to protect the safety of persons installing, removing,
   monitoring, repairing, or adjusting the electronic tracking device, or to protect the
7  integrity of the investigation, surreptitiously enter the subject vehicle at any time of the
   day or night, and move the subject vehicle from one location to another for the purpose of
8  installing, removing, monitoring, repairing, or adjusting the device;

9            c.    Surreptitiously re-enter the subject vehicle at any time of the day or
10 night, for the purpose of installing, removing, monitoring repairing, or adjusting the
   device; and

11           d.    Continuously monitor any and all signals emitted from the device,
12 including when the vehicle enters any structure or private property in which there may be
   a reasonable expectation of privacy.

13                           **AGENT BACKGROUND**

14      15.    I am a "law enforcement officer of the United States" within the meaning
15 of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct

16 investigations of, and to make arrests for, offenses enumerated in Title 18, United States

17 Code, Section 2516.  I have been a Special Agent with Homeland Security Investigations

18 (HSI) since April 2010.  I am presently assigned to a Narcotics Investigations group in

19 Seattle that focuses on narcotics trafficking and money laundering in the Western District

20 of Washington.  From April 2010 through February 2018 I was assigned to the HSI

21 Office in San Diego, California, where I conducted narcotics and money laundering

22 investigations on the southwest border.  I am cross-designated and have the authority to

23 conduct Title 21 investigations and enforcement activities.  I have been involved with

24 investigations for Title 21 offenses working closely with other agencies, including the

25 Drug Enforcement Administration.

26      16.    As a federal law enforcement officer for over 10 years, I have received
27 formal training, as well as extensive on the job training, relative to the investigation of

28 narcotics trafficking, money laundering, bulk cash smuggling, black market peso

exchange, transportation, layering, structuring and other techniques used to launder illicit proceeds. I have participated in investigations which involved the use of electronic surveillance techniques and have been involved in multiple federal wiretap investigations. I have monitored or overheard numerous calls or meetings between informants or undercover agents, drug traffickers and money launderers. I have investigated illicit narcotics, controlled substances, money laundering, bulk cash smuggling, and other crimes that have resulted in arrests, indictments, and convictions. While participating in these and other criminal investigations, I have executed search warrants on businesses, residences, vehicles, and storage facilities. As a result of these investigations, I have become familiar with methods and techniques used by narcotics traffickers to import narcotics into the U.S. and distribute those narcotics within the U.S. and the methods and techniques used by money launderers and narcotics traffickers to derive, launder, and conceal illicit proceeds, and to use these proceeds to promote and facilitate unlawful activity. I have also participated in undercover operations which involved the collection, transportation, exportation and laundering of illicit proceeds derived from the sale of narcotics and other items.

17.     I have participated in investigations in which money launderers and drug traffickers relied heavily upon telephone communication as a means of communicating with their associates, confidential informants, cooperating individuals, and undercover officers. I have interviewed individuals who have been directly and indirectly involved in amassing, spending, converting, transporting, distributing, laundering, and concealing proceeds of narcotics trafficking. I have also worked and consulted with numerous law enforcement officers experienced in narcotics and money laundering investigations. As a result, I am familiar with how money launderers and drug traffickers speak to each other and generally conduct business. For example, I am aware that money launderers and drug traffickers discussing criminal matters over the phone often speak in code or in vague terms. I am also aware that these subjects frequently (1) provide false subscriber information to the service providers, (2) use phones which are subscribed to under

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 6
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

identities other than their own, and (3) change phones in order to avoid detection by law enforcement.

18.     This training and experience forms the basis for my opinions expressed below.  All dates and times listed below are approximate unless otherwise noted.  When this affidavit refers to vehicle ownership, either I or other agents involved in the investigation have reviewed the relevant state vehicle records from the Washington State Department of Licensing (DOL), or the equivalent agency in other states.  Similarly, when I refer to identification documents, either I or other agents involved in the investigation have reviewed the relevant driver license or similar records maintained by DOL or the equivalent agencies in other states.  When I refer to the criminal history of a subject, either I or other agents involved in the investigation have reviewed the available criminal history from state or federal agencies.  When I refer to telephone subscription records, either I or other agents involved in the investigation have reviewed the subscriber records obtained from the telephone company by administrative subpoena or court order, or I have obtained the information from other law enforcement officers familiar with this investigation.  When I refer to telephone toll records, either I or other agents involved in the investigation have received the information from the telephone company pursuant to an administrative subpoena or court authorized pen registers.  When I refer to beliefs or suspicions held by investigators, these beliefs or suspicions are based upon training and experience.

19.     In the following paragraphs, I describe communications between various individuals.  Except where specifically indicated with quotation marks, the descriptions are summaries of the conversations and are not intended to present a verbatim recitation of the words used by the participants.  I know through training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, that individuals involved in the distribution of controlled substances, bulk currency, and other criminal activity often use vague references and/or coded words and phrases when discussing illegal activity.  When such words are used in the this

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 7
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

investigation, I have used this training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, to include what I believe to be an accurate translation of these coded words and phrases. In the context of transcribed calls, I have included in parentheses the translation for coded words and phrases used by the participants. All of the referenced conversations occurred in Spanish and have been translated by fluent Spanish speakers.

20.    Because of my personal participation in this investigation and because of information provided to me by other agents and officers, I am familiar with the facts and circumstances of this investigation. My familiarity with this investigation is further based on information relayed to me by other law enforcement personnel, discussions with other experienced officers, detectives, and agents, review of law enforcement reports, and interviews of witnesses.

21.    The information outlined below is provided for the limited purpose of establishing probable cause in support of my application for pen register/trap-and-trace devices (PRTTs) and search and tracking warrants, and does not contain all details or all facts of which I am aware that relate to this investigation.

## PROBABLE CAUSE

### The DEA Investigation

22.    In December 2019, members of DEA Tacoma began their investigation into Luis DOMINGUEZ-ARCE following an undercover purchase of approximately one ounce of cocaine from Juan ALVARO Lopez-Roblero. DEA agents utilized a King County Sheriff's Office (KCSO) detective acting in an undercover (UC) capacity. The purchase took place at Cousins Tire and Automotive Center, at 110 South 112th Street, Seattle, Washington. Agents observed the UC (UC1) arrive at the tire shop and meet with ALVARO. ALVARO told UC1 to come back later and meet with his associate about the drugs. Later that day, agents observed UC1 return to the tire shop and meet with an unidentified Hispanic male driving a black 2006 Chrysler 300, bearing Washington plate BOA7738, registered to Luis Antonio DOMINGUEZ-ARCE. During

the meeting, UC1 acquired the suspected cocaine for $1,200 from the unidentified Hispanic male.  At the conclusion of the buy, UC1 drove to a pre-determined neutral location for a debrief of the operation.  At the neutral location,  agents showed UC1 a picture of DOMINGUEZ-ARCE and UC1 confirmed that was the individual who gave him/her the suspected cocaine.  Later that day, agents field-tested the drugs and they tested positive for cocaine.

23.    On January 8, 2020, agents conducted a controlled purchase of methamphetamine and suspected counterfeit fentanyl pills from DOMINGUEZ-ARCE for $6,500, again utilizing UC1.  The deal took place at the Mazatlan Mexican restaurant, located at 6003 244th Street SW, Mountlake Terrace, Washington.  In the days before the controlled purchase, DOMINGUEZ-ARCE had given UC1 a new cell phone number, 253-785-1630, to contact him (DOMINGUEZ-ARCE).  UC1 used 253-785-1630 to arrange the purchase of one pound of methamphetamine and 500 fentanyl-laced imitation oxycodone pills from DOMINGUEZ-ARCE.

24.    At approximately 12:30 p.m., agents met with UC1 at a predetermined neutral location in order to give him/her a concealed listening/recording device as well as $6,500 of buy money.  Agents directed UC1 to drive to the Mazatlan restaurant in anticipation of the deal, and maintained surveillance on UC1's vehicle along the entire drive to the deal location.  Simultaneously, surveillance units established positions in the vicinity of 16614 48th Avenue West, Apartment J101, Lynnwood, Washington.  This is the registered address for DOMINGUEZ-ARCE's black Chrysler 300 (the vehicle agents observed during the controlled buy in December 2019).

25.    At approximately 1:40 p.m., agents observed DOMINGUEZ-ARCE exit the "J" building of the apartments, walk towards his black Chrysler 300, and depart.  Surveillance units maintained observation of the Chrysler as it travelled to the Mazatlan restaurant.  At approximately 2:00 p.m., Special Agent Jeremy Tan observed the Chrysler pull in and park at the Mazatlan restaurant in the vicinity of UC1's vehicle.  Moments later, Special Agent Tan observed DOMINGUEZ-ARCE exit the driver's side of the

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 9
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

Chrysler and enter the front passenger seat of UC1's vehicle. Through the use of the concealed listening/recording device, agents overheard UC1 meeting with DOMINGUEZ-ARCE.  Shortly thereafter, Special Agent Tan watched DOMINGUEZ-ARCE exit the UC's vehicle, walk back to the Chrysler, and depart the area.  UC1 departed the restaurant moments later and drove back to a neutral location (under constant surveillance by investigators).  Following the deal, TFO Eric Janson and Special Agent Steve Meyer met with UC1 and took custody of the suspected methamphetamine and pills.   TFO Janson field-tested the suspected methamphetamine, as witnessed by Special Agent Meyer, and it tested positive for methamphetamine.

26.     Agents conducted surveillance on DOMINGUEZ-ARCE throughout February and into early March 2020.  Consistently, agents were unable to find DOMINGUEZ-ARCE at his residence and observed different people driving his vehicles. Additionally, around this time, initial restrictions from the COVID-19 pandemic restricted agents' ability to conduct surveillance and ascertain DOMINGUEZ-ARCE's current whereabouts.

27.     In late September 2020, agents directed UC1 to attempt to contact DOMINGUEZ-ARCE.  UC1 did, and said DOMINGUEZ-ARCE responded and told UC1 that he (DOMINGUEZ-ARCE) was currently in Mexico, but would be returning to Washington soon.  DOMINGUEZ-ARCE said UC1 could contact 425-448-4612 if he needed anything.  DOMINGUEZ-ARCE said the user of that number was the guy who had replaced him in Washington.

28.     In October 2020, UC1 received a call from a Mexico number, 52-6871934307.  The user of this phone identified himself as "KIKE," said he was DOMINGUEZ-ARCE's boss, and ran the drug operation in Washington.  KIKE said he used the Mexico number but was located in the State of Washington.  In subsequent conversations throughout October, KIKE informed UC1 that he had any type of drug, to include heroin, methamphetamine, and pills, and it was just a matter of UC1 placing an order.  UC1 asked KIKE about prices for methamphetamine and fentanyl-laced imitation

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 10
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

oxycodone pills.  KIKE said a pound of methamphetamine would be $3,800 and it was $6 per pill.  UC1 acknowledged the information and told KIKE he would contact him when he was ready to order.

29.     On November 10, 2020, agents conducted a controlled purchase of methamphetamine and fentanyl-laced imitation oxycodone pills from KIKE's courier for $2,450, utilizing UC1.  The deal took place at the Wingstop Bellevue, located at 14875 Main Street, Bellevue, Washington.  Days before the controlled purchase, KIKE had given UC1 cell phone number 253-321-8142, to contact the courier.  On the day of the deal, UC1 spoke with the user of 253-321-8142 and arranged the purchase of a half-pound of methamphetamine and 100 fentanyl-laced imitation oxycodone pills.

30.     At approximately 2:00 p.m., agents met with UC1 at a predetermined neutral location in order to give him/her a concealed listening/recording device as well as $3,000 of buy money.  Agents directed UC1 to drive to the Wingstop Bellevue in anticipation of the deal, and maintained surveillance on UC1's vehicle along the entire drive to the deal location.  Simultaneously, surveillance units established positions in the vicinity of the Wingstop at 14875 Main Street, Bellevue, Washington.

31.     At approximately 3:00 p.m., agents observed UC1 arrive at the Wingstop and park.  A few minutes later, through the use of the listening/recording device, law enforcement officers observed UC1 take a call from the courier, who was using telephone number 253-321-8142 (TT5).  UC1 attempted to direct the courier to his (UC1's) location.  Shortly thereafter, agents observed a blue Toyota Corolla, bearing Washington license plate BVV2864 (TV11), arrive and park next to UC1's vehicle.  Agents then observed UC1 exit the vehicle, walk over to the front passenger door of the Corolla, and get inside.  Shortly thereafter, agents watched UC1 exit the courier's vehicle and get back inside his own.  A few minutes later, agents observed the Corolla leave the area.  UC1 left shortly thereafter and drove back to the neutral location (under constant surveillance by investigators).  While at the neutral location, UC1 received a call from the courier (TT5), asking UC1 to meet him again.  The courier explained he had made an error and

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 11
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

had possibly given the UC 200 fentanyl-laced imitation oxycodone pills instead of the agreed-upon 100 pills.  However, after terminating the call, the courier called back and told UC1 everything was fine, that there had been no error.

32.     Following the deal, TFO Janson and Special Agent Meyer met with UC1 and took custody of the suspected methamphetamine and pills.   TFO Janson field-tested the suspected methamphetamine, as witnessed by Special Agent Meyer, and it tested positive for methamphetamine.

33.     On March 5, 2021, agents conducted a controlled purchase of approximately a pound of suspected methamphetamine from another one of KIKE's couriers for $3,400, again utilizing UC1.  The deal took place at 900 160th Avenue NE, Bellevue, Washington.  In the days before the controlled purchase, UC1 contacted KIKE at Mexico number 52-6878782419 and discussed doing a deal.  KIKE indicated UC1 could call whenever he needed something.  On the day of the deal, UC1 contacted KIKE and indicated he/she wanted to do some business.  Shortly thereafter, an unidentified male (UM4) using **telephone number 206-618-7780 (TT9)** contacted UC1, confirmed what UC1 wanted and told him/her where the deal would take place.

34.     At approximately 4:00 p.m., agents met with UC1 at a pre-determined neutral location in order to give him/her a concealed listening/recording device as well as $3,400 of buy money.  Agents then directed UC1 to drive to 900 160th Avenue NE, Bellevue, Washington in anticipation of the deal, and maintained surveillance on UC1's vehicle along the entire drive to the deal location.  Simultaneously, surveillance units established position in the vicinity of 900 160th Avenue NE, Bellevue, Washington.

35.     At approximately 5:00 p.m., agents observed UC1 arrive at 900 160th Avenue NE.  A few minutes later, agents heard UC1 said he/she was attempting to direct the courier to his/her location in the parking lot.  UC1 said he/she was communicating with UM4, the user of **TT9**.  Shortly thereafter, agents observed a **white 2010 Toyota Camry, bearing Washington license plate BWP9426 (TV14)**, arrive and park near UC1's vehicle.  Agents then observed UC1 exit his/her vehicle, walk over to the front

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 12
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

passenger door of **TV14**, and get inside.  Shortly thereafter, agents watched UC1 exit the vehicle and get inside his/her own.  A few minutes later, agents observed **TV14** depart the area.  UC1 left shortly thereafter and drove back to the neutral location (under constant surveillance by investigators).  While at the neutral location, Special Agent Eric Rodenberg and Special Agent Meyer met with UC1 and took custody of the suspected methamphetamine.  Later that evening, Special Agent Meyer field tested the suspected methamphetamine, as witnessed by Special Agent Rodenberg, and it tested positive for methamphetamine.

36.     On March 7, 2021, UC1 contacted agents and told them that DOMINGUEZ-ARCE had contacted him/her using **telephone number 206-578-8948 (TT10)**.  UC1 said DOMINGUEZ-ARCE explained that he had arrived back in Seattle in the last couple of days and could be reached at **TT10**.  DOMINGUEZ-ARCE also said he had talked to the boss and learned that UC1 purchased some methamphetamine recently.

### *The HSI Investigation*

37.     In October 2020, Homeland Security Investigations (HSI) Special Agents initiated an investigation into a Money Laundering Organization (MLO) suspected of operating as a cleansing and transfer mechanism of narcotics proceeds for drug cartels. The methodology used by the MLO is to employ individuals to pick up currency, delivered by third parties, in cities throughout the U.S.  The investigation has shown that some of these third parties are active members of identified Drug Trafficking Organization (DTO) cells operating in various cities.  One of the locations that the MLO/DTO regularly operates in is the Seattle, Washington area.

38.     On February 23, 2021, HSI Seattle Agents received information that an individual, in the Seattle area was in possession of approximately $140,000 in bulk currency that he/she needed to deliver to a third party so that it could be laundered and deposited into financial accounts.  HSI Seattle passed an undercover telephone number

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 13
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

and the serial number of a dollar bill[1] to another HSI office and were told, by that office, to expect a call to that number from an individual who was controlling the $140,000 in bulk currency.

39.     Later that day, at approximately 11:58 a.m., an undercover Seattle Police Department officer (UC2) received a call from an unidentified male (UM1) using **telephone number (206) 531-6802** (**TT6**).  During the call, UM1 told UC2 that he was ready to deliver.  UC2 told UM1 that he/she would call UM1 back in 2-3 hours.  At approximately 12:20 p.m., UC2 called UM1 (**TT6**) and said he/she (UC2) was currently in Spokane and would not be back in the Seattle area for a couple of hours.  UM1 stated that he was currently in the Bellevue area and that he would like to deliver the money to UC2 somewhere close to Bellevue.

40.     At approximately 5:36 p.m., UC2 contacted UM1 (**TT6**) and told UM1 that he/she (UC2) would not be able to pick up the money that night, and that it would have to wait until tomorrow.  UM1 asked UC2 if they could meet early the next morning.  UC2 agreed.

41.     The following day (February 24, 2021) at approximately 9:36 a.m., UC2 contacted UM1 (**TT6**).  UC2 told UM1 he/she would not be able to meet with UM1 but was going to send his/her brother.  UM1 agreed.  UC2 told UM1 that he could meet UC2's brother around the Factoria area in Bellevue around 11 a.m.  UC2 also told UM1 that his/her brother would contact UM1 to arrange the currency delivery.  Following this call, UC2 then contacted another undercover HSI agent (UC3) who was going to physically receive the money from UM1.  UC2 told UC3 that upon initial greetings with UM1, UC3 should state that he/she was calling "de parte del Chavo" (on behalf of Chavo).

---

[1] This is a common method of identification used by MLOs, to ensure that the person receiving the money is the contracted/vetted person intended to receive the money.  The person delivering the money verifies that the person receiving the money is in possession of the dollar bill with the correct serial number.

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 14
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

42.     At 9:47 a.m., UC3 dialed **TT6** and stated he/she was calling "de parte del Chavo." UC3 and UM1 agreed to meet at 11:00 a.m. in Bellevue. UM1 asked UC3 to send him an address. UC3 acknowledged. Following the phone call, UC3 and another undercover operative (UC4) parked at the Walmart located at 12620 SE 41st Pl in Bellevue, Washington, in preparation for the meeting with UM1. At approximately 10:56 a.m., UC3 called **TT6** and instructed UM1 to meet him in the Walmart parking lot. UM1 (**TT6**) told UC3 he would arrive in approximately five minutes. About 20 mintues later, UC3 called UM1 and directed him to UC3's location in the parking lot. UM1 told UC3 that he was driving a silver Toyota vehicle.

43.     Shortly thereafter, UC3 and UC4 observed a **silver Toyota Rav4 bearing Washington license plate BQA6215** (**TV12**) park next to their undercover vehicle. A vehicle registration check showed **TV12** is registered to Luis Antonio DOMINGUEZ-ARCE at 16614 48th Ave W, Apt J101, Lynnwood, WA. The driver of the Rav4 (UM1) stepped out the vehicle and greeted UC3 and UC4. UM1 was in possession of a brown paper bag which he handed to UC3. UC3 placed the paper bag in the UC vehicle. The meeting concluded shortly thereafter. At approximately 11:18 a.m., surveillance units observe UM1 get back into the driver's seat of **TV12** and depart the area. Agents maintained continuous surveillance via ground and air units on UM1 as he drove out of the Factoria area.

44.     At 11:24 a.m., UC3 received a missed call from **TT6**. At 11:27 a.m., UC3 called **TT6** and spoke with UM1. UM1 told UC3 that the bag contained "142" and not "140." UM1 said there were "thirteen of ten" and "one of 12." UC3 acknowledged.

45.     During the surveillance of **TV12**, law enforcement observed UM1 conduct numerous driving techniques that suggested he was engaging in counter-surveillance measures to determine whether he was being followed. UM1 turned down dead-end streets and made multiple last-second lane switches. UM1 was also observed driving down side streets at a slow rate of speed, and took a route from the meeting location to his final destination that was not the most direct route of travel. At approximately 11:33

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 15
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

a.m., air surveillance observed **TV12** pull into the Port Apartment complex and park in front of 14031 SE 4th Street Bellevue, WA.  Air surveillance agents did not see UM1 exit the vehicle but had their view obstructed for a moment as they circled overhead.  At approximately 12:00 p.m., law enforcement conducted surveillance on foot and observed that **TV12** was currently unoccupied.  They discontinued surveillance at that time.

46.     Following the undercover meeting, HSI Seattle agents took possession of the brown paper bag from UC3 and UC4 at a neutral location.  It contained an undetermined amount of US currency.   Agents transported the currency to HSI Seattle's main office in downtown Seattle.  There, HSI personnel opened the brown paper bag and pulled out 14 packages of currency that were wrapped in duct tape and saran wrap.  HSI personnel noticed that 13 of the packages had the number "10" written on the outside and one of the packages had the number "12" written on it.  A count of the currency later revealed that UM1 delivered $142,000 to UC3 and UC4.

47.     Two days later, on February 26, 2021, HSI Seattle agents received information that an individual in the Seattle area was in possession of approximately $150,000 in bulk currency that he/she needed to deliver to a third party so that it could be laundered and deposited into financial accounts.  HSI Seattle passed an undercover telephone number and a serial number of a dollar bill to another HSI office and were told, by that office, to expect a call to that number from an individual who was controlling the $150,000 in bulk currency.

48.     At 5:03 p.m. that day, UC3 received a text message from **telephone number 206-712-0120 (TT7)** that read, "Que tal, hay si me puede regresar la llamada hablo de parte de Chilindrina" (What's up, please return my call I'm calling on behalf of Chilindrina).  At 5:45 p.m., UC3 dialed **TT7** and spoke to a male (UM2).  UM2 told UC3 that he was calling on behalf of "Chilindrina" and was in Bellevue.  UC3 told UM2 he was in Spokane and would return to the Seattle area the following Tuesday.  UC3 asked UM2 if he had the dollar bill.  UM2 said he had the dollar bill close by.  UM2 told UC3

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 16
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

that he would call him back to finalize details surrounding their meeting.  This telephone call was recorded.

49.     At 5:52 p.m., UM2 (**TT7)** called UC3 and told UC3 that UM2 was advised that the meeting was to occur that day.  UC3 told UM2 he/she was unavailable and that the meeting would have to take place on Tuesday.  UM2 told UC3 that the decision was not up to him and that he would discuss it with his side.  This telephone call was also recorded.

50.     The following Monday, March 1, 2021, UC3 received a text message from **telephone number 206-661-8358** (**TT8**) at 9:33 a.m. that read, "K dise oiga" (What's going on) and "Hablo departe de la chilondrina [sic]" (I'm calling on behalf of the chilondrina).

51.     At 9:47 a.m., UC3 dialed **TT8** and spoke to a different male (UM3).  UM3 told UC3 that he was calling about the young man from Friday and about the tickets. UC3 acknowledged and stated the phone call was on behalf of the "chilindrina."  UM3 acknowledged and said he was UM2's boss.  UC3 told UM3 that he/she was on a trip and would return later that evening.  UC3 asked UM3 where he was located.  UM3 said he was near Bellevue.  UC3 told UM3 he/she was not expecting the call and that he/she would have to verify UM3's phone number with UC3's associates.  UM3 acknowledged and said the money was ready for delivery and that he had a photograph of the dollar bill. This telephone call was also recorded.

52.     At 5:01 p.m., UC3 received a text message from **TT8** that read, "Si hablo para confirmer" (Did you call to confirm).  At 6:35 p.m., UC3 received a telephone call from **TT8**.  During the call, UM3 asked if UC3 had confirmed everything.  UC3 said that he/she had and that he/she was available the following day at 11:00 a.m.  UC3 asked UM3 to state the last four characters of the dollar bill that were given to him.  UM3 said, "3 4 7 A."  UM3 asked UC3 how much he/she was told the pickup amount would be. UC3 stated, "150" (referring to $150,000).  UC3 told UM3 that he/she would be in

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 17
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

Bellevue at approximately 11:00 a.m. the next day (March 2, 2021) for the pick-up. This telephone call was also recorded.

53.    On the morning of March 2, 2021, I provided UC3 with a one dollar bill bearing serial number H02567347A. UC3 and UC4 parked at the Target store located at 4053 Factoria Mall SE in Bellevue, Washington, in preparation for the currency pick-up. At 10:53 a.m., UC3 called UM3 (**TT8**). UC3 instructed UM3 to meet him/her at the Target store in the Factoria Mall in Bellevue. UM3 told UC3 that he was close by and requested UC3 send him the address. UM3 then told UC3 that he was going to send "El Chavalo" (the kid) to conduct the pickup. This telephone call was recorded.

54.    UC3 then had the following text message exchange with **TT8**:

UC3 to **TT8**:  4053 Factoria Square Mall SE, Bellevue Target (sent at 10:54 a.m.).

**TT8** to UC3:  "Aki le digo en cuanto tiempo llega el chavalo" (I'll let you know the kid's time of arrival soon) (sent at 10:55 a.m.).

55.    At 10:57 a.m., UM3 called UC3 and told him that the kid would arrive in 15 minutes. UM3 told UC3 that the kid would call UC3 prior to his arrival. This telephone call was also recorded. Fifteen minutes later, UC3 received a telephone call from **TT7**. The male user of **TT7** told UC3 that he was calling to deliver a ticket and was at the address he had been given. The male user of **TT7** said he was driving a gray Honda and that he was next to the Verizon Store. UC3 told the male to circle the mall and directed him into UC3's location in the parking lot. This telephone call was also recorded. At 11:18 a.m., UC3 received another telephone call from **TT7**; the male user said he was next to a trailer and that he would arrive momentarily. This telephone call was also recorded.

56.    Shortly thereafter, UC3 and UC4 observed **a grey Honda CRV, bearing Washington license plate BXT9535 (TV13)** park next to their undercover vehicle. A vehicle registration check showed the CRV is registered to "Carlos Ramirez-Eden" at 2813 Gibson Road, Everett, WA 98204. The driver of the CRV (whom UC3 and UC4

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 18
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

then recognized as UM2) stepped out the vehicle and greeted UC3 and UC4.  UC3 asked
UM2 if he wanted the dollar bill and handed him the dollar bill bearing serial number
H02567347A.  UM2 subsequently stepped away from UC3 and UC4 and made a phone
call.  Following his telephone conversation, UM2 reapproached UC3 and UC4 and said
everything was in order.  UM2 then removed a black Armani Exchange shopping bag
from the CRV and placed it on the rear passenger seat of UC3 and UC4's vehicle.  UM2
told UC3 that the Factoria Mall was a good place to conduct the exchange, however he
had previously observed a security vehicle roaming the parking lots.  The meeting (which
was video- and audio-recorded) concluded shortly thereafter.

57.     At approximately 11:23 a.m., surveillance units saw UM2 get back into the
driver's seat of **TV13** and leave the area.  Agents maintained continuous surveillance on
UM2 as he exited the Factoria area in **TV13**.  During this surveillance, law enforcement
observed UM2 travel at a rate of speed below the speed limit and frequently checking his
rear-view mirrors.  Agents believe this was UM2's method of determining whether he
was followed from the meet location.  At approximately 11:32 a.m., surveillance units
observed **TV13** pull into the Port Apartment complex and park in the back of the
apartment complex close to 14346 SE 4th Street in Bellevue.  This is the same apartment
complex HSI agents followed UM1 (driving **TV12**) to after the prior money pick-up from
UM1, and the same apartment complex DEA agents followed Kike's courier (the driver
of **TV14**) to after their last controlled buy on March 5, 2021.  Surveillance units did not
see UM2 exit the vehicle but did lose sight of **TV13** for a moment as it was parking.  At
approximately 12:25 p.m., law enforcement confirmed that **TV13** was unoccupied and
discontinued surveillance.

58.     Following the meeting between UM2, UC3, and UC4, HSI Seattle agents
took possession of the black Armani Exchange shopping bag at a neutral location.
Following the surveillance, HSI Seattle agents transported the bag (containing an
undetermined amount of currency) to HSI Seattle's office.  There, HSI personnel opened
the shopping bag and found 16 packages of currency that were wrapped in rubber bands.

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 19
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

A later count of the currency revealed that UM2 delivered $150,000 in US currency to UC3 and UC4.

### HSI/DEA Investigation Overlap

59.     Following the currency pick-ups, law enforcement database checks and telephone toll analysis showed significant overlap between the HSI currency pick-up investigation and the DEA-led narcotics investigation.  On February 24 2021, UM1 arrived at the meeting with UC2 and UC3 driving a silver Toyota Rav4 registered to Luis DOMINGUEZ-ARCE.  DOMINGUEZ-ARCE is a subject of the DEA investigation described herein, and the suspected user of **TT10**.  Furthermore, toll analysis of T-Mobile historical records for **TT6** obtained via subpoena showed that **TT6** had approximately 43 contacts with Mexico telephone number 52-6878782419 in February 2021.  The user of this telephone number has been identified in the DEA investigation as a source of supply who goes by the name "KIKE."  These contacts took place from February 7, 2021 through February 22, 2021.  Agents do not know the full nature of the overlap between the two investigations, but believe that through use of PRTT devices and real-time location data for the five phones described herein, as well as the use of the tracking devices on the three vehicles described herein, they will be able to determine more specifically the nature and extent of the investigative overlap.

### USE OF LOCATION DATA

60.     In my experience, the geographic location information requested in this Affidavit is useful in drug trafficking and money laundering investigations as the information can be used to: (1) aid surveillance during suspected drug deals; (2) help locate and identify target residences, DTO stash houses, and other storage locations; (3) help identify where known and unknown conspirators live and the vehicles they drive; (4) help identify sources of supply, customers, and other unknown conspirators who assist in the distribution of narcotics and/or help launder the cash drug proceeds; (5) help understand geographic breadth of the DTO how and where conspiracies operate; (6) help identify locations of money transfer businesses used by members of the conspiracy to

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 20
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

launder cash drug proceeds or through which money is exchanged between co-conspirators; and (7) help identify transportation sources used by the conspirators.

61.     Based upon my training and experience, one way to identify co-conspirators is to covertly follow target telephones with the use of electronic tracking, known to be utilized in furtherance of drug trafficking and money laundering offenses, and then conduct an investigation using the addresses the vehicles/devices travel to. Based upon the location information, I would then direct other investigators to conduct surveillance at the addresses and determine if criminal activity was occurring there, which in turn could lead to potential names of conspirators and potential narcotics storage locations used by the DTO.  Obtaining this location information is critical to accurately identifying such co-conspirators and locations, as the residences of the targets are often times in either remote, rural areas, or small residential neighborhoods, which make close, physical surveillance by agents almost impossible to accomplish without being discovered by the suspects.

62.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.  Currently, the Target Telephones have the IMSI/IMEI numbers described in Paragraph 1 above, and in Attachments A1 through A5, respectively.

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 21
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

63.     Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call.  They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content.  In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

64.     Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts.  The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

65.     Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network.  When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI.  Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication.  Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

66.     In my training and experience, I have learned that T-Mobile and AT&T are companies that provide cellular telephone access to the general public.  I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which

they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records).  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

67.     Based on my training and experience, I know that cellular service providers such as T-Mobile and AT&T can collect E-911 Phase II data about the location of the Target Cell Phones, including by initiating a signal to determine the location of the Target Cell Phones on their respective networks or with such other reference points as may be reasonably available.

68.     When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, carry out application initiated data transfers, among other things.

69.     Based on my training and experience, I know that T-Mobile and AT&T can collect cell-site data about the respective Target Cell Phones they provide service to. Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the

communication; and (5) the duration of the communication.  I also know that wireless providers such as T-Mobile and AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

70.     Different service providers use different systems, applications, and reports to collect or analyze cell site data.  These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon), Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD" (Sprint), Network Event Location System or "NELOS" (Verizon), EVDO, ALULTE, Timing Advance, and TruCall.   RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

71.     Based on my training and experience, I know that wireless providers such as T-Mobile and AT&T typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as T-Mobile and AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify a Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

72.     Based on the foregoing, I request that the Court issue the proposed search warrant and pen-trap order for the five Target Telephones described herein, pursuant to

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 24
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

Federal Rule of Criminal Procedure 41, 18 U.S.C. § 2703(c), and 18 U.S.C. § 3123. I believe that the facts described in this Affidavit establish probable cause to believe that the Target Telephones have been used and will be used to facilitate violations of Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances) and Title 18, United States Code, Section 1956 (money laundering).

73.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice to the subscriber or user of the Target Cell Phone until at least 90 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

74.     I further request that the Court direct T-Mobile and AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile and AT&T, respectively. I also request that the Court direct T-Mobile and AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile and AT&T's services, including by initiating a signal to determine the location of the Target Cell Phones on the respective provider's network or with such other reference points as

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 25
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

1   may be reasonably available, and at such intervals and times directed by the government.

2   The agency shall reasonably compensate T-Mobile and AT&T for reasonable expenses

3   incurred in furnishing such facilities or assistance.

4      75. Pursuant to 18 U.S.C. § 2703(g), the government will execute the warrant

5   by serving the warrant on T-Mobile and AT&T, respectively.  Because the warrant will

6   be served on T-Mobile and AT&T, who will then compile the requested records and data,

7   reasonable cause exists to permit the execution of the requested warrant at any time in the

8   day or night.  I therefore request that the Court authorize execution of the warrant at any

9   time of day or night, owing to the potential need to locate the Target Cell Phones outside

10   of daytime hours.

11      76. I also request the Court issue the requested warrant to track the three Target

12   Vehicles described herein pursuant to Federal Rule of Criminal Procedure 41.  I believe

13   that the facts described in this Affidavit establish probable cause to conclude the Target

14   Vehicles have been used, and will continue to be used, to facilitate violations of Title 21,

15   United States Code, Section 841(a)(1) (distribution of controlled substances) and Title

16   //

17   //

18   //

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 26
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

18, United States Code, Section 1956 (money laundering).  I believe such tracking will provide agents with information regarding the location and identification of sources of supply, couriers, stash residences (for both drugs and cash proceeds), and associates and/or co-conspirators that are not yet identified.

77.    I am presenting this affidavit and the applications electronically pursuant to Local Criminal Rule CrR 41(d)(3).

SCOTT MACDONALD
Special Agent
Homeland Security Investigations

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the  16th day of March, 2021.

MARY ALICE THEILER
United States Magistrate Judge

AFFIDAVIT OF SPECIAL AGENT SCOTT MACDONALD - 27
USAO # 2018R00760

**EXHIBIT 1**

<u>DECLARATION</u>

I, Marci L. Ellsworth, declare as follows:

1.     I am a duly appointed Assistant United States Attorney for the Western District of Washington, and I have primary responsibility for representing the interests of the United States herein.

2.     I make this declaration in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.  Pursuant to 18 U.S.C. § 3122(a)(1), I am the applicant for purposes of the pen-trap portion of the requested warrant and order.

3.     Pursuant to 18 U.S.C. § 3122(b), I certify that Homeland Security Investigations and the Drug Enforcement Administration are the law enforcement agencies conducting the investigation in this matter and that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by them.

4.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Application is made on the basis of information officially furnished, and on that basis I verily believe such information to be true.

Executed this 16th day of March, 2021.

*s/ Marci L. Ellsworth*
MARCI L. ELLSWORTH
Assistant United States Attorney

EXHIBIT 1 -- PAGE 1
USAO # 2018R00760

**ATTACHMENT A1**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone assigned call number 206-531-6802, with International Mobile Subscriber Identity (IMSI) number 310260042717793, and listed subscriber(s) "Jorge Cruz" (the "Target Cell Phone"), that are in the custody or control of T-Mobile, a company headquartered at 4 Sylvan Way Parsippany, NJ 07054.  The subscriber/customer of the Target Cell Phone is "Jorge Cruz."  The identity of the person who is the subject of the criminal investigation is unknown.

2.      The Target Cell Phone.

ATTACHMENT A -- PAGE 1
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

**ATTACHMENT A2**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone assigned call number 206-712-0120, with International Mobile Subscriber Identity (IMSI) number 310260058892122, and listed subscriber "Juan Ochoa" (the "Target Cell Phone"), that are in the custody or control of T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  The subscriber/customer of the Target Cell Phone is "Juan Ochoa."  The identity of the person who is the subject of the criminal investigation is unknown.

2.      The Target Cell Phone.

1

**ATTACHMENT A3**

2

**Property to Be Searched and Subscriber/Subject Information**

3      1.      Records and information associated with the cellular phone assigned call

4  number 206-661-8358, with International Mobile Subscriber Identity (IMSI) number

5  310410296914848, and listed subscriber "Eduardo Fragoso" (the "Target Cell Phone"),

6  that are in the custody or control of AT&T, a company headquartered at 11760 U.S.

7  Highway 1, North Palm Beach, FL 33408.  The subscriber/customer of the Target Cell

8  Phone is "Eduardo Fragoso."  The identity of the person who is the subject of the

9  criminal investigation is unknown.

10      2.      The Target Cell Phone.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A -- PAGE 3
USAO # 2018R00760

**ATTACHMENT A4**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phone assigned call number 206-618-7780, with International Mobile Subscriber Identity (IMSI) number 310150735905365, and listed subscriber "Ulises Morros125Yahoocom," (the "Target Cell Phone"), that are in the custody or control of AT&T, a company headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.  The subscriber/customer of the Target Cell Phone is "Ulises Morros125Yahoocom."  The identity of the person who is the subject of the criminal investigation is unknown.

2.      The Target Cell Phone.

ATTACHMENT A -- PAGE 4
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT A5**

**Property to Be Searched and Subscriber/Subject Information**

1.     Records and information associated with the cellular phone assigned call number 206-578-8948, with International Mobile Subscriber Identity (IMSI) number 310260040310030, and listed subscriber "Ana Dominguez" (the "Target Cell Phone"), that are in the custody or control of T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  The subscriber/customer of the Target Cell Phone is "Ana Dominguez."  The identity of the person who is the subject of the criminal investigation is Luis DOMINGUEZ-ARCE.

2.     The Target Cell Phone.

ATTACHMENT A -- PAGE 5
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127.  As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Cell Phones.  **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).**  Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below.  *See* 18 U.S.C. § 3103a(b)(2).

I.     **Section I:  Information to be Disclosed by T-Mobile and AT&T**

1.     **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the respective Account listed in Attachments A1, A2, A3, A4, and/or A5:

a.     Names (including subscriber names, user names, and screen names);

b.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.     Local and long distance telephone connection records from October 1, 2020, to present;

d.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions from October 1, 2020 to present;

e.     Length of service (including start date) and types of service utilized;

f.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

ATTACHMENT B -- PAGE 1
USAO # 2018R00760

Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Pen Register/ Trap and Trace Data and Associated Subscriber Records to Be Provided for a Period of 45 Days.**

a.      T-Mobile and AT&T, respectively, shall install and monitor pen-trap devices to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phones including the date, time, and duration of the communication, and the following, without geographic limit and without notice to the subscriber:

(i)      IP addresses associated with the cell phone device or devices used to send or receive electronic communications;

(ii)     Any unique identifiers associated with the cell phone device or devices used to make and receive calls with the cell phone number described in Attachment A, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

(iii)    IP addresses of any websites or other servers to which the cell phone device or devices connected; and

(iv)    Source and destination telephone numbers and email addresses.

b.      On a 24-hour-a-day basis, for the duration of the authorized pen-trap devices, T-Mobile and AT&T shall provide the following records for those subscribers whose identifiers are obtained pursuant to the use of the pen-trap devices:  published or non-published subscriber names and addresses, including billing addresses.

ATTACHMENT B -- PAGE 2
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

3.      **Historical Cell Cite Location Information.**

a.      All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from October 1, 2020, to present, including:

i.      the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii.      historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received. This information is to be provided irrespective of the application, name, or report utilized by T-Mobile and AT&T. Accordingly, this information includes the following data sets to the extent that they are collected by T-Mobile and AT&T: RTT, PLU, PCMD, NELOS, EVDO, TruCall, ALULTE, and Timing Advance.

b.      The physical address and coverage maps of cell towers used by the respective Target Cell Phone.

4.      **Prospective Cell Site Location Information.**

a.      All information about the location of the respective Target Cell Phone described in Attachment A1, A2, A3, A4, and/or A5 for **a period of 45 days**, during all times of day and night. This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by the respective Target Cell Phone.

5.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of the respective Target Cell Phone described in Attachment A1, A2, A3, A4, and/or A5 for **a period of 45 days**,

ATTACHMENT B -- PAGE 3
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A1, A2, A3, A4, and/or A5.

                b.      The physical address and coverage maps of cell towers used by the respective Target Cell Phone.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile and AT&T, respectively, T-Mobile and AT&T are required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), T-Mobile and AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile and AT&T's services.  The government shall compensate T-Mobile and AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

**II.**    **Section II:  Information to Be Seized by the Government**

1.     All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 1956, involving Luis DOMINGUEZ-ARCE and his associates.

2.     All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.     All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

4.     Location Information regarding the respective Target Cell Phone.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency

ATTACHMENT B -- PAGE 4
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800

1  personnel assisting the government in this investigation, and outside technical experts
2  under government control) are authorized to review the records produced by T-Mobile
3  and AT&T in order to locate the things particularly described in this Warrant.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ATTACHMENT B -- PAGE 5
USAO # 2018R00760

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON, 98402
(253) 428-3800